UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| V. | : | CR. NO. 06-90-ML |
| | : | |
| RICHARD M. CECCA | : | |

DEFENDANT'S PRESENTENCE MEMORANDUM

Although the Defendant has made only limited comments to the Presentence Investigation Report (PSR) submitted by the Probation Department, he does wish to bring certain matters to the Court's attention with respect to his upcoming sentencing. The Defendant respectfully suggests to the Court that while the United States Sentencing Guidelines (the "Guidelines") are still a significant factor in the sentencing calculus[1], there are other factors subject to consideration pursuant to 18 U.S.C. §3553(a), that suggest the appropriateness of a "non-Guideline" [2], or "variance"[3] sentence, i.e., a sentence outside the advisory Guideline range.

[1] United States v. Jiminez-Beltre, 440 F.3d 514, 518-519 (1st Cir. 2006), cert.denied, 2007 WL 36306, 75 U.S.L.W. 3350 (2007). As noted in the PSR, the sentencing range provided for in the Guidelines is 27-33 months, and pursuant to the plea agreement, the Government is recommending the lowest sentence possible in that range.

[2] "A non-Guidelines sentence is a sentence that is 'neither within the applicable Guidelines range nor imposed pursuant to the departure authority in the [Sentencing] Commission's policy statements.' *United States v. Crosby*, 397 F.3d 103, 111 n. 9 (2d Cir. 2005)." United States v. Ratoballi, 452 F.3d 127, 129 fn. 1 (2d Cir. 2006).

[3] United States v. Hampton, 441 F.3d 284, 287 (4th Cir. 2006).

As the Court is aware from the details provided in the PSR, the Defendant faces two separate health concerns: his own and those of his mother.[4]

The Defendant's Medical Condition

While the Bureau of Prisons (BOP) is probably equipped to handle at least some of the many and various health problems faced by the Defendant, the fact that BOP facilities exist for this purpose is not the only consideration in deciding whether and to what extent incarceration is appropriate for this Defendant in the particular circumstances of this case. In fact, the Defendant has not suggested, nor does he here, that he is presently in need of medical treatment available only in a BOP hospital, and he is not requesting a medical facility designation from the Court. His medical records, however, do provide sufficient information for the Court to determine that if incarcerated, he would be a classic candidate for a Court recommendation to a camp, but one that is attached to a hospital

[4]No specific references will be made to these various health matters out of consideration for the privacy issues associated with them. The PSR (paragraphs 46 through 50) and the confidential information already provided to the Probation Department adequately describe the medical condition of the Defendant, and his mother's condition is outlined in paragraph 38 of the PSR, as well as in the Defendant's letter to the Court attached thereto, and the letters dated January 17, 2007 from Mrs. Cecca's neurologist, Dr. Donald Marks, and January 19, 2007 from her primary care physician, Dr. John Wengryn (with his follow-up visit attachment), along with a set of Mrs. Cecca's medical records. The medical records and correspondence from the doctors have been separately filed with the Court under seal.

facility (such as F.M.C. Devens).[5] In the event that the Defendant’s medical problems became an issue during incarceration, at least in these circumstances, some treatment would not be far away.

On the other hand, there is much to be said for allowing the opportunity for the Richard to continue to be treated by his current medical professionals, particularly Dr. Goranitis, who has been treating him for the past 11 years, and who is thoroughly familiar with the myriad medical problems he has encountered, some of which may reasonably be described as chronic. Likewise, as the Court has seen from the list of Richard’s current medications, balancing this regimen of medicines is a somewhat delicate matter, and is certainly aided by Dr. Goranitis’ familiarity with the patient and his conditions.

The Defendant’s Mother’s Condition

As the Court can see from the information provided in or attached to the PSR and the communications from her treating physicians, the Defendant’s mother is not only elderly but in extremely poor health, suffering from conditions that have required her son’s constant attention over the past several

[5] The Defendant specifically requests, in the event the Court imposes an incarcerative sentence of any duration that is not one of community confinement, that the Court specifically include in the Judgment and Commitment Order a recommendation that the Defendant be designated to serve any such sentence at the Satellite Camp at F.M.C. Devens.

years. Richard is his mother's primary care-provider, performing what are, in effect nursing services, as well as a 24/7 regimen of complete care.[6]

Richard and his family, along with his mother's social services and medical care providers, continue with the laborious process of attempting to arrange substitute care for Richard's mother. Thus far, the only viable alternative to Richard's round-the-clock care appears to be a nursing home. This remedy is particularly unattractive for a variety of reasons: for one thing, the cost of these services in a nursing facility (or, even if available, at home) will be staggering, especially when compared with the present cost, which is effectively nothing. For another, removing this elderly and ailing woman from her home environment could itself have deleterious effects on both her physical and mental health. Other family members simply cannot step into the breach, particularly for the length of time the Guidelines would make Richard unavailable. The loss occasioned by Richard's absence would therefore negatively impact both caretaking and financial support.[7]

[6]As previously noted, privacy considerations prevent describing this regimen but it is outlined in detail in Richard's letter to the Court.

[7]See footnote 9, below, citing U.S.S.G. §5H1.6 cmt. n. 1 (B), inserted by Amendment 651, effective October 27, 2003. See also, Dr. Marks' correspondence dated January 17, 2007, and Dr. Wengryn's correspondence dated January 19, 2007, along with Mrs. Cecca's medical records (see footnote 4, above).

The Defendant does not suggest, necessarily, that his own medical problems, standing alone, would form an adequate basis for a significantly lower sentence than that determined by the Guidelines (although he would unquestionably be better off both physically and mentally if he could continue to be treated by his primary care physician who is most familiar with his medical history and current conditions). He does suggest, however, that when combined with his continuing commitment to care for his fragile and ailing mother, considerations of individual circumstances lean in favor of a sentence below the Guidelines.

The Law

Although much of the case law concerning the consideration of health issues in sentencing was developed during the pre-Booker[8] period of mandatory application of the Guidelines, it is clear that the Court is empowered to take the defendant’s health into account in structuring a sentence appropriate to any case and its particular circumstances. The same is true in considering the issue of “family circumstances” or “care of a family member.” Performing this task is made somewhat difficult by the fact that the context in which many of these decisions were rendered was that of downward departures pursuant to U.S.S.G. §5H1.4 rather than as a §3553(a) factor.

[8]United States v. Booker, 543 U.S. 220 (2005).

(A) Richard's Health Issues

Since a defendant's medical condition has been found in the past (i.e., pre-Booker) to be a factor adequately considered by the Guidelines, departure jurisprudence made below-Guideline sentences on this basis especially rare because the standard for demonstrating extraordinary conditions or those "not sufficiently considered" was so high. As a §3553 factor, however, the "departure" threshold is not the standard. Rather,

> [i]n selecting a sentence, a district court will ordinarily calculate the applicable Guidelines range and then determine 'whether other factors identified by either side warrant an ultimate sentence above or below the guideline range.' [United States v. Jiminez-Beltre, 440 F.3d 514], at 519. The court is also bound to consider the sentencing factors set out in 18 U.S.C. § 3553(a). [footnote omitted] [citation omitted].

United States v. Alli, 444 F.3d 34, 40 (1st Cir. 2006). And the Court may give the same weight to medical conditions as to any other Guideline (or non-Guideline) factor. As noted in Alli, the fact that a sentence falls within the Guideline range does not automatically make it reasonable under the particular circumstances of the case. Id., at 41. See also, Jiminez-Beltre, 440 F.3d at 518. Likewise, a sentence that falls outside of the Guideline range is not automatically unreasonable. Hampton, 441 F.3d at 287.

With respect to the medical condition of defendants generally as a factor in any sentencing determination, the Court

is always bound to give weight to the fact that many inmates at federal correctional facilities have various medical problems, and the BOP maintains a number of facilities designed specifically to address this concern. Like any other population, that of federal prison inmates has many of the same issues "civilian" populations face in their communities, and the government has developed programs, procedures and methods of dealing with these issues on a continuing basis.

However, unlike the civilian community, federal prison inmates have no choices concerning their healthcare, and are invariably separated from their own primary health-care providers by incarceration. While this is not always a critical issue (and in fact, may not be in most cases), there are situations where removing a particular provider from the healthcare scene, especially after a very long period of association and treatment, could be detrimental to a defendant; and unless it is absolutely necessary to do so, proper medical protocol would not likely recommend it. If it is possible under the particular set of circumstances to avoid a significant disruption in what has been a long-term treatment relationship between a patient and his medical care provider, then such a course should be followed. See, e.g., United States v. Seiber, 2005 WL 1801614 (E.D.Tenn. 2005) (defendant's Guideline range in Oxycontin case was 97 to 121 months; court performed departure analysis and found

departure not warranted, partially because the court could not find that BOP could not provide care; court ultimately sentenced defendant to probation under §3553, in part to enable her to maintain current treatment with her own medical professionals).

In the present case, the Defendant suggests that the nature and history of his various medical conditions, and his long-term treatment by Dr. Goranitis, recommend allowing this relationship and its treatment to continue uninterrupted. Moreover, to the extent that pre-Booker jurisprudence may not have allowed a downward departure on this basis, post-Booker, equal consideration of the other §3553 factors may justify a sentence below what the Guidelines would ordinarily have called for. As Senior Judge Sifton recently noted in Simon v. United States, 361 F.Supp.2d 35, 42-43 (E.D.N.Y. 2005), app.dism., 185 Fed.Appx. 115 (2nd Cir. 2006): "Although the Guidelines do not ordinarily account for a defendant's health problems, absent an "extraordinary physical impairment," U.S.S.G. § 5H1.4, post-*Booker* I may consider that [the defendant's] health is substantially more impaired than most defendants'. This both renders [the defendant] a greater burden on the federal prison system, and incarceration a greater burden on [the defendant]."

(B) Family Circumstances

The issue of caring for a family member has also been the subject of numerous opinions that, not surprisingly, go both ways. Under pre-Booker jurisprudence, downward departures on this basis pursuant to U.S.S.G. §5H1.6 were rare, but in cases in which they were granted, factors somewhat similar to those present here were found to exist.

For example, in United States v. Sclamo, 997 F.2d 970, 971 (1st Cir. 1993), the Court upheld a downward departure based on the importance of the defendant's continued presence in the home for the psychological benefit of a disturbed child with whom he lived and who viewed the defendant as his stepfather. In rejecting the government's appeal of Judge Keeton's decision to sentence the defendant to three years' probation with six months of home confinement rather than the Guideline-mandated sentence of 28 months' incarceration, the Court reviewed is prior holding in United States v. Rivera, 994 F.2d 942 (1st Cir. 1993), in which it modified the standards for review of Guideline departures, and made the following observations, particularly apt here:

> The resolution of this appeal is governed by our recent pronouncements in ***United States v. Rivera.*** As ***Rivera*** makes clear, the Guidelines say only that family circumstances do not ordinarily warrant departure. ***See*** 994 F.2d at 948 (citing U.S.S.G. Ch. 5, Pt. H). Thus, while discouraging departures on this ground, the Guidelines recognize that "special,

> unusual or other-than-ordinary circumstances," *id. at 948,* may be considered as a basis for departure. Indeed, our earlier cases do not hold that district courts lack authority to depart on this ground but merely illustrate circumstances not sufficiently extraordinary to warrant departure. ***See, e.g., United States v. Rushby,*** 936 F.2d 41, 43 (1st Cir.1991).
>
> We briefly recapitulate the approach ***Rivera*** suggests when a departure from the Guidelines is requested. The district court first should ask: "What features of this case, potentially, take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case?" ***Rivera,*** 994 F.2d at 949. In cases like this, where the special features are discouraged, the court should "go on to decide whether the case is nonetheless not 'ordinary,' ***i.e.,*** whether the case differs from the ordinary case in which those features are present." ***Id.*** If the case is not ordinary, the court then may consider departure, deriving whatever guidance it can from the Guidelines, but, ultimately, "drawing upon experience and informed judgment," ***id.*** at 949. If the court decides to depart, "it must explain how the case (compared to other cases where the reason is present) is special...." ***Id.*** at 950 (emphasis omitted).

Sclamo, 997 F.2d at 973.

Noteworthy is the observation that some courts have found the applicable Guideline (U.S.S.G. §5H1.6) to be less than clear, making departure determinations more susceptible to judicial discretion, even before Booker.[9] See, e.g., United

[9]Eventually (pre-Booker), the Sentencing Commission began to provide more guidance in this area. See, United States v. Eisinger, 321 F.Supp.2d 997, 1005 (E.D.Wis. 2004):

> The Commission recently amended § 5H1.6 to provide additional guidance in the consideration of such departures. ***United States v. Jebara,*** 313 F.Supp.2d 912, 915-16 (E.D.Wis.2004). Of significance in the present case is the Commission's statement that:
>
> A departure under this policy statement based on the loss of caretaking or financial support of the defendant's family requires

States v. Thompson, 190 F.Supp.2d 138, 143-144 (D.Mass. 2002).[10] Thompson was decided in light of United States v. Pereira, 272 F.3d 76 (1st Cir. 2001). Pereira was factually similar to the present case, and one in which the Court found that because "family considerations" was a "discouraged" departure ground, and the circumstances there fell within the "heartland" of similar "family circumstance" cases, departure was not warranted.[11] But see, e.g., United States v. Haversat, 22 F.3d 790, 797-798 (8th Cir. 1994; United States v. Gaskill, 991 F.2d 82, 85-86 (3d Cir. 1993). As a matter of post-Booker jurisprudence, however, the Guidelines' sometimes Draconian view

> ... the presence of the following circumstances:
> (i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.
> (ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant.
> (iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.
> (iv) The departure effectively will address the loss of caretaking or financial support.
>
> U.S.S.G. § 5H1.6 cmt. n. 1 (B).

[10] See also, United States v. Lacarubba, 184 F.Supp.2d 89, 93 (D.Mass. 2003).

[11] At least one court has observed (post-Booker) that national sentencing uniformity was not being achieved under the Guidelines anyway, primarily because of departures and other circumstances, and that downward departure rates varied in districts around the country from a low of 1.4% to a high of 62.6%, largely because of the government's own use of charging decisions and presentations of facts, and of substantial assistance departures, which accounted for 49% of the total. See, United States v. Lauersen, 362 F.3d 160, 166-167 (2d Cir. 2004), vac. and rem. in light of Booker, 543 U.S. 1097 (2005).

of the heartland[12] and departures therefrom is no longer either binding on the Court or entitled to greater weight than the particular circumstances of the case at bar.[13] The Defendant suggests that had Pereira been decided after Booker rather than before, the district court's sentence would have been upheld. Sometimes, only the perseverance of the district judge in the pursuit of justice will make the difference. See, e.g., United States v. Menyweather, 447 F.3d 625 (9th Cir. 2006)(district court imposed pre-Booker sentence in mail fraud case with sufficient downward departure to eliminate incarceration, reimposed the same sentence twice after remands, and eventually prevailed on final resentencing after Booker). As the Court noted in Menyweather,

> [t]he conclusions that we reached in [previous cases] are consistent with the First Circuit's view that, when evaluating departures for family responsibilities under § 5H1.6, courts should assess the nature of the care that the defendant provides to his or her family members and determine whether "there are ***feasible*** alternatives of care that are relatively comparable" to the defendant's. ***United States v. Roselli,*** 366 F.3d 58, 68-69 (1st Cir. 2004) (internal quotation marks omitted).

[12]This view has resulted in some truly unfortunate sentencing determinations. See, e.g., United States v. Louis, 300 F.3d 78 (1st Cir. 2002).

[13]There appears to be a split in the circuits "on the question of whether appellate review of post-***Booker*** sentences should include an assessment of the district court's authority to depart under the Guidelines." United States v. Menyweather, 447 F.3d 625, 627 and fn. 1 (9th Cir. 2006).

Id., at 633. [In Roselli, a pre-Booker decision, the First Circuit affirmed a downward departure by Judge Woodlock based on exceptional family circumstances.]

Because sentencing is an individualized process, each case, with its respective circumstances, is different, and requires a sentence designed to fit those circumstances. As Chief Judge Molloy recently observed in United States v. Hoskins, 364 F.Supp.2d 1214, 1215 (D.Mont. 2005):

> The problem in the case is simple. The advisory Guideline calculation recommends a life sentence. In my view, after considering the factors the Congress identified for consideration in reaching a just sentence, *see* 18 U.S.C. § 3553(a), a life sentence does not fit the bill.

Judge Molloy went on to distinguish between pre- and post-Booker sentences:

> The prosecution asks me to impose a life sentence simply because it is the sentence dictated by the advisory Guidelines. That argument assumes that *Booker's* abandonment of mandatory Guidelines is illusory. Upon examination of the entire *Booker* opinion, I am convinced that the Supreme Court did not intend for the Guidelines to be advisory in theory but mandatory in fact. Following *Booker,* I am empowered to give a legally reasonable sentence, irrespective of what the Guidelines would require. There will no doubt be many cases in which the sentence suggested by the Guidelines is reasonable. Since the *Booker* decision, it is my experience that the great majority of cases fall into this category. The case of [this defendant], however, is not one of them.
>
> Id., at 1216.

See also, Hampton, 441 F.3d at 289 (Diana Gribbon Motz, Circuit Judge, concurring):

> However, there will undoubtedly be cases in which a sizable variance sentence better serves the § 3553(a) factors. ***See, e.g., United States v. Williams,*** 435 F.3d 1350, 1354-55 (11th Cir. 2006) (per curiam) (affirming a sentence that was more than fifty percent below the suggested guideline range); ***United States v. Hadash,*** 408 F.3d 1080, 1084 (8th Cir. 2005) (affirming the district court's six-level variance as “reasonable based on the § 3553(a) factors”). Moreover, automatic application of the guidelines without proper consideration of the other § 3553(a) factors would contravene *Booker's* mandate. ***See*** 125 S.Ct. at 757. Thus, in fashioning a reasonable sentence, district courts must properly calculate the advisory guideline range and then must determine what sentence-one within the advisory range or outside of it-most effectively meets the factors set forth § 3553(a).

Although the Defendant believes that he can provide the most comprehensive care to his mother and simultaneously minimize his own medical problems, he recognizes that a completely non-incarcerative sentence may be found by the Court to unduly depreciate the seriousness of the offense. In those situations, there is precedent for a split sentence, which would minimize the time that others, if available, would have to care for Richard’s mother and his time away from his primary medical provider would also be shortened. See, e.g., United States v. Jebara, 313 F.Supp.2d 912 (E.D.Wis. 2004) (defendant convicted of conspiracy to commit mail and wire fraud; Guideline range was 21-27 months; while rejecting sentence of probation, court

imposed split sentence of 5 months' imprisonment followed by 5 months' home confinement as condition of supervised release). See also, Haversat, 22 F.3d at 798. Likewise, in a case with family circumstances similar to those presented here, the Court in United States v. Leon, 341 F.3d 928 (9th Cir. 2003), affirmed a downward departure from a guideline range of 27-33 months for 32 counts of preparing false income tax returns to a split sentence of 8 months' incarceration followed by 8 months of home confinement in order that defendant be available to care for his ailing wife.

(C) The §3553(a) Factors

In addition to the Guidelines [§3553(a)(4)] and the Sentencing Commission policies [§3553(a)(5)], the Court must consider the factors enumerated in §3553(a)(1), including "the history and characteristics of the defendant." Although Richard was not a drug addict or a career criminal, and did not suffer from many of the ills that cause courts to consider issues such as "extraordinary rehabilitation" it is notable that in his case, he has turned his life around since the time of the offenses for which he stands convicted. This "recovery" is largely due to the responsibility he has undertaken in caring for his mother, his self-described recognition of his improper conduct, and the support he has received from his family. How the court defines this concept in Richard's case and, more

importantly, how it factors it into the sentencing equation, is now a relevant consideration post-Booker. As Senior Judge Weinstein recently observed in United States v. Hawkins, 380 F.Supp.2d 143, 159 (E.D.N.Y. 2005):

> The Federal Sentencing Guidelines permit a lesser sentence upon a showing of "extraordinary rehabilitation," which, as explained above, often means turning a "bad" life into a decent, honorable, law-abiding life. For those who have led decent, honorable, law-abiding lives to the point of criminality, the Federal Sentencing Guidelines, as construed by some, offer, as already noted, the remote possibility of relief via a different path-when the defendant can show that the criminal conduct was "aberrant." The question then becomes, what of the relatively decent, generally law-abiding citizen who errs more than once, or over some extended period, but once prosecuted, is likely to be done with crime for good? A theoretical challenge is how, under the Guidelines, an individual can demonstrate that a return to "normal" or "average" is extraordinary.
>
> Since *Booker* the answer seems to be that such a person gets no help from the Guidelines, but does from the much broader and more flexible section 3553 of title 18 of the United States Code. ***Cf. United States v. Brady,*** No. 04-cr-0729, 2005 WL 1706509, at *8, 417 F.3d 326, 335 (2d Cir. July 22, 2005) ("The fact that we find [that] the district court's decision to depart in this case does not conform to the requirements of the Guidelines-now made advisory by *Booker*-would not necessarily render [defendant's] sentence unreasonable."). That provision requires the court to avoid a sentence greater than necessary. 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary....").

And in considering the other elements of §3553(a)(1), i.e., the "circumstances of the offense", it is appropriate here, although certainly not dispositive, to consider that at the time

the offenses were committed, Richard was affected by the treatment regime he was then undergoing as a result of the medical condition from which he suffered at the time (see PSR, ¶46, and Defendant's Letter to the Court, at p. 1).

The requirement of §3553(a) that the sentence imposed shall be "sufficient, but not greater than necessary" to meet the goals of sentencing is obviously of greater significance when there are real questions, as there are here, about how severe a sentence is actually "necessary."

As is true of all defendants, Richard comes before this Court with his own baggage. However, §3553 allows the Court to place him and the criminal events to which he has pled guilty in perspective. Although this view must be taken in light of the defendant's background, it is often more important when looking forward rather than backward. Hawkins, 380 F.Supp.2d at 161:

> Certainly, as required by section 3553 post-*Booker,* in considering the offender's characteristics with greater depth and breadth than through a simple automatic index of past offenses, "extraordinary rehabilitation" may take into account a person's "starting point" in terms of family history, socioeconomic position, and significant personal obstacles. This approach reflects an understanding that "the consequences of an act go endlessly forward in time and its causes stretch back to the dawn of human history...." *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 235 (2d Cir. 1999).

And in considering the combination of all §3553(a) factors, some of them must be examined together. See, Simon, 361 F.Supp.2d at 43. In United States v. Carey, 368 F.Supp.2d 891, 895 (E.D.Wis. 2005), the original Guideline range was 15-21 months, but was reduced because of the government's method of charging the offense. The court then found:

> The resulting advisory range was 12-18 months, which I found reasonable. Defendant argued for a non-guideline sentence of probation with community confinement. However, given the nature of the offense and the need to deter others, I found that a sentence which did not include a substantial period of confinement would unduly depreciate the seriousness of the crime and would not satisfy the purposes of sentencing set forth in § 3553(a)(2). Therefore, I decided to impose a sentence within the modified range. Due to defendant's family situation, his minimal prior record, his efforts to pay restitution and the need to pay much more, I imposed a sentence of one year and one day, which I found sufficient, but not greater than necessary. I also ordered defendant to make restitution to the SSA and serve a three-year supervised release term upon his release from prison.

These circumstances are present here as well. It is likely that some order of restitution will be entered. Although his counsel disagreed with its assessment,[14] the Probation Department has determined in the PSR that the Defendant's future earning capacity makes the imposition of financial penalties feasible. Either way, it is obvious that Richard cannot earn any money or make any restitution payments during a period of incarceration.

[14]See Counsel's Response to PSR filed with Probation on January 18, 2007.

Section 3553(a)(2)(A) is always of great concern to the Court, and since the inception of the Guidelines, it has replaced rehabilitation as the overriding consideration in sentencing. See, United States v. Roman, 989 F.2d 1117, 1121-1122 (11th Cir. 1993), cert.denied, 511 U.S. 1129 (1994). But the Guidelines have also allowed some anomalous situations to develop in this area. See, e.g., United States v. Caldwell, 448 F.3d 287, 293 (5th Cir. 2006) (defendant [Blakemore] convicted of conspiracy to acquire 24 handguns, some of which were transported from Louisiana to New Jersey and sold outside the legal firearms market and used in narcotics activity; guideline sentencing range was only 24-30 months).

Even the considerations mandated by §3553(a)(2)(B) [as well as (a)(2)(A)] may be accomplished with a significant reduction in the advisory Guideline sentencing range. See, e.g., United States v. Baker, 445 F.3d 987, 992 (7th Cir. 2006) (defendant convicted in child pornography case; advisory Guideline range calculated at 108-135 months; sentence of 87 months upheld on government appeal).

In the present case, while any sentence of incarceration may have some deterrent effect on others, it is nearly impossible to gauge this effect or even assume its application with any certainty. To the extent that the crime is one of

opportunity, it is less likely to have much deterrent effect.[15] And the goal of general deterrence may be reached without the imposition of a prison sentence. Hawkins, 380 F.Supp.2d at 177. As to the specific deterrence component of §3553(a)(2)(C), it should be clear to the Court from the materials already submitted that this Defendant is most unlikely to recidivate; moreover, it has been recognized that the risk of recidivism declines with age. United States v. Nellum, 2005 WL 300073, at *3 (N.D.Ind. Feb. 3, 2005). Richard is already 54 and not getting any younger.

Finally, as to §3553(a)(2)(D), it does not appear that the Defendant would benefit from any term of incarceration for any of the reasons stated there.

As to §3553(a)(3), since there is no mandatory minimum sentence provided by statute, practically any sentence is available, including one that can be crafted by the Court to

[15]See, United States v. Sagendorf, 445 F.3d 515, 518 (1st Cir. 2006); cf., United States v. Adelson, 441 F.Supp.2d 506, 514 (S.D.N.Y. 2006):

> As for prison time, the Court concluded that, notwithstanding all the mitigating factors outlined above, meaningful prison time was necessary to achieve retribution and general deterrence. But as to the latter, there is a considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective "white collar" offenders. *See, e.g.,* Richard Frase, *Punishment Purposes,* 58 Stanford L.Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?,* 23 S. Ill. U. L.J. 485, 492 (1998). *Cf.* United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* 56 (2004) (noting that the Sentencing Guidelines were written, in part, to "ensure a *short but definite* period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence") (emphasis supplied); transcript of sentence, *U.S. v. Saad,* 1/17/06, at 33 (similar remarks of Government prosecutor at time of Dr. Saad's sentence).

include only those elements necessary to make the sentence "sufficient, but not greater than necessary" to meet the responsibilities of the Court, the government and the Defendant in this situation.

Richard respectfully asks this Court to consider the imposition of such a non-Guideline sentence as will maximize his availability to continue to care for his mother in her home and simultaneously minimize the risks attendant upon his own medical issues. Logic dictates that, without compromising the Court's principles, something less severe than what is called for by the Guidelines must surely "fit the bill."

Respectfully submitted,
Richard M. Cecca,
By His Attorney,

/s/ Edward G. Lawson 1/23/07
Edward G. Lawson #0517
260 Lonsdale Avenue
Pawtucket, RI 02860
401 725 1810
401 725 2244 fax

**Certification**

I certify that I electronically forwarded a copy of the within to Richard W. Rose, Esq., Assistant U. S. Attorney, U. S. Department of Justice, United States Attorney, District of Rhode Island, 50 Kennedy Plaza, 8th Floor, Providence, RI 02903 and by fax and regular mail to the Office of the Probation Officer, 2 Exchange Terrace, 3rd Fl., Providence, RI 02903 on the 22nd day of January, 2007.

/s/ Edward G. Lawson 1/23/07